# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 14, 2012 Session

## STATE OF TENNESSEE v. WAYNE DONALDSON

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Davidson County
No. 2009C2849     Cheryl A. Blackburn, Judge**

**No. M2010-00690-SC-R11-CD - Filed August 24, 2012**

An officer stopped the defendant for a traffic violation. When the officer ordered the defendant out of his vehicle to sign the citation, he observed what appeared to be a bag of cocaine on the floorboard of the driver's side. Charged with possession with intent to sell or deliver twenty-six grams or more of cocaine in a school zone, the defendant moved to suppress the evidence as the product of an unlawful seizure. The trial court sustained the motion, and the Court of Criminal Appeals affirmed. This Court granted the State's application for permission to appeal. Because an officer, after making a lawful stop for a traffic violation, may routinely direct the driver outside of the vehicle, the order of suppression is reversed, and the cause is remanded for trial.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals is Reversed; Remanded to the Criminal Court for Davidson County**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Mark A. Fulks, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellant, the State of Tennessee.

James Bryan Lewis, Nashville, Tennessee, for the appellee, Wayne Donaldson.

## OPINION
Shortly after midnight on March 20, 2009, Wayne Donaldson (the "Defendant") made a right turn at a traffic light from Gallatin Road in Davidson County onto Old Hickory Boulevard. Officer Joshua Baker of the Metropolitan Nashville Police Department observed the Defendant drive past the white stop line before coming to a halt and then turn right

without giving a turn signal. Based upon his determination that the Defendant had violated two separate ordinances by failing to properly stop prior to a turn and by failing to use a turn signal, Officer Baker activated his blue lights, and the Defendant stopped in a Walmart parking lot. After acquiring the vehicle registration and driver's license from the Defendant, who remained seated in his vehicle, Officer Baker returned to his patrol car, checked on the Defendant's prior criminal history, and wrote out a citation for the traffic offenses. Although there were no active warrants against the Defendant at the time, Officer Baker determined that he had prior driving under the influence offenses and had previous drug-related charges. Officer Baker, who had prepared a citation,[1] returned to the vehicle and asked the Defendant to step outside. As the Defendant opened the door of his vehicle, Officer Baker saw what appeared to be a bag of cocaine on the floorboard of the driver's side. The Defendant was placed under arrest and charged with possession with intent to sell or deliver twenty-six grams or more of a substance containing cocaine, a Schedule II drug, within 1,000 feet of a school. See Tenn. Code Ann. §§ 39-17-417 (Supp. 2008) & -432 (2006).

**Motion to Suppress**

Prior to trial, the Defendant filed a motion to suppress the seized drugs, arguing that the search violated article I, section 7 of the Tennessee Constitution and the Fourth Amendment to the United States Constitution. The Defendant first argued that the initial stop of his vehicle was not supported by either reasonable suspicion or probable cause and further contended that even if there was a proper basis for an investigatory stop, the officer had unreasonably prolonged its duration by asking the Defendant to step outside of his vehicle.[2]

At the hearing on the motion, Officer Baker, the only witness to appear, testified that he was following the Defendant's vehicle on Gallatin Road when the Defendant stopped suddenly in a turn lane at a red light, having driven completely beyond the line on the street

---

[1] An officer who observes a misdemeanor of this nature "shall issue a traffic citation to the person in lieu of arrest, continued custody and the taking of the arrested person before a magistrate." Tenn. Code Ann. § 55-10-207(a)(1) (2008).

[2] "Routine traffic stops" have been generally addressed as follows:

> Given that police can easily come by a factual basis for a traffic stop, that such stops are often motivated by drug-enforcement purposes, and that there exists virtually no basis for questioning the initiation of such a stop because of its pretextual or arbitrary nature, it is apparent that the permissible dimensions of a lawful traffic stop are matters of some importance.

Wayne R. LaFave, The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment, 102 Mich. L. Rev. 1843, 1862 (2004).

marking the proper stopping point. When the Defendant then turned right without signaling, Officer Baker initiated the stop. He stated that after a brief conversation, he took the Defendant's license and registration, returned to his police vehicle, and wrote a citation for the failure to properly stop and the failure to use a turn signal. Officer Baker testified that when he returned to the Defendant's car, he asked him to step outside, explaining that "I wanted to get a feel for him[,] . . . to see if maybe he had been drinking to get a perspective of him."

On cross-examination by the defense, Officer Baker acknowledged that he did not detect any alcohol on the Defendant's breath, did not suspect that the Defendant had drugs at the time of the stop, and had no indication that the Defendant might be armed. He described the initial encounter as "nothing out of the ordinary." The officer further testified that when he "went back to the vehicle to ask [the Defendant] to step out, part of that was to speak with him and to get him to sign the ticket." When, however, the Defendant got out of his car and Officer Baker saw the "clear plastic bag with a white powder substance," his "point of emphasis transferred to that bag" and, in consequence, he did not deliver the traffic citation until the Defendant was booked for the drug offense. Upon continued questioning by defense counsel, Officer Baker further explained his rationale for directing the Defendant out of his car:

> Q: Why would you want to observe him further when you had no suspicion that he was armed, dangerous, or had any drugs on him? Why would you not just simply hand him the ticket inside the vehicle? Mr. Donaldson, sign it and [you're] on your way. Why would you not do that?
>
> A: Like I said, I normally have people step out of the vehicle. I judge their demeanor, I see how they're acting.
>
> Q: Why would you need to judge his demeanor at this point if you had [seen] nothing out of the ordinary?
>
> A: Just it was part of him getting out of—part of him signing the citation as well.

Defense counsel then asked the officer whether his police training was "to keep people within the vehicle so you can keep them under control." Officer Baker disagreed, responding that there was a safety concern:

> There's a better chance of it getting out of control [if the person stays in the car] because . . . everything inside the vehicle is an unknown. They could have

a gun sitting in the floorboard waiting for us to walk back up. If I get them out of the vehicle, I can see their hands . . . .

When questioned by the trial judge, Officer Baker acknowledged that he gave back the driver's license to the Defendant "[w]hen he stepped out of the vehicle." He clarified that he had first asked the Defendant to step outside of the vehicle before returning the license.

In its memorandum opinion, the trial court first determined that Officer Baker had a reasonable basis to stop the Defendant because of his failure to properly signal for a right turn. While recognizing that police officers may routinely ask drivers to exit the vehicle as a part of a properly based investigatory stop, the trial court concluded that the stop had ended at the point that Officer Baker approached the vehicle to deliver the traffic citation and return the driver's license. Because the officer had been "unable to articulate any reason as to why further observation . . . was necessary," the trial court ruled that "[t]he request . . . to exit the vehicle was not reasonably related to the stop" and granted the motion to suppress.

Afterward, the State filed a motion to reconsider the order of suppression. The trial court, some six weeks after the hearing, upheld its original ruling and also included the following statement in its order of denial: "This . . . ruling would be different had Officer Baker made the request to exit the vehicle prior to returning the driver's license." The trial court concluded, however, that Officer Baker had returned the Defendant's license "either immediately before or as he asked Defendant to step out of the vehicle," and that "[t]he citation had been already . . . completed and only required [his] signature."

On appeal by the State, the Court of Criminal Appeals affirmed, concluding that the trial court had implicitly ruled that the officer's explanation for requiring the Defendant to step out of the vehicle was not credible and holding that even though an officer may require a driver to exit a vehicle during a traffic stop, the authority had to be based upon a legitimate concern for safety. State v. Donaldson, No. M2010-00690-CCA-R3-CD, 2011 WL 4340854, at *11 (Tenn. Crim. App. Sept. 15, 2011). The Court of Criminal Appeals relied, in part, upon a footnote in the majority opinion of Pennsylvania v. Mimms, 434 U.S. 106 (1977) and interpreted its language to require an examination of the circumstances in each case, rather than providing "carte blanche authority" to routinely order drivers out of the vehicles after a traffic stop:

> [W]e do not hold today that "whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car." We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable

searches and seizures.

Donaldson, 2011 WL 4340854, at *8 (citation omitted) (quoting Mimms, 434 U.S. at 111 n.6).

In this appeal, the State argues that because Officer Baker made a valid traffic stop, which was still in progress at the time the Defendant was directed to step out of his vehicle, the trial court erred by suppressing the evidence. In response, the Defendant submits that this is "not a Mimms case," but is instead an illustration of a "police tactic" used after a lawful investigatory stop involving an unconstitutional search and seizure and a prolonged, unlawful detention. The Defendant contends that Mimms does not always provide the police with the authority to require a driver to step out of a vehicle after a traffic stop based upon either reasonable suspicion or probable cause. He submits that because there existed no relationship between Officer Baker's directive and his personal safety, the ruling of the trial court should be upheld.

**Standard of Review**

The standard of review applicable to suppression issues is well established. When the trial court makes findings of fact after a suppression hearing, its conclusions are binding upon this Court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). As a general rule, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. It is only when the findings of fact are based entirely on evidence that does not involve issues of witness credibility that an appellate court conducts a de novo review. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Appellate review of a trial court's application of law to the facts is de novo, with no presumption of correctness. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999)).

**Analysis**

Our state and federal constitutions offer protection from unreasonable searches and seizures. The general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression. See U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 (providing that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures"). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967); see also State v. Bridges, 963

S.W.2d 487, 490 (Tenn. 1997). This Court has recognized three categories of police interventions with private citizens: (1) a full scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrong-doing; and (3) a brief police-citizen encounter, requiring no objective justification. State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). Constitutional protections apply "to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citing Davis v. Mississippi, 394 U.S. 721 (1969)); see also Terry v. Ohio, 392 U.S. 1, 21 (1968) (holding that an investigatory stop must be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). An automobile stop constitutes a "seizure" within the meaning of both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. See Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990); Delaware v. Prouse, 440 U.S. 648, 653 (1979); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).[3] Although the State bears the burden of proof when a search or seizure is conducted without a warrant, Yeargan, 958 S.W.2d at 629, the stop of a vehicle is reasonable when the police have proper basis to believe a traffic violation has occurred. State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007).[4]

Initially, as to any suggestion that Officer Baker may have used the traffic stop as a "police tactic" to investigate other possible offenses for which no basis existed, there is no absolute prohibition against a pretextual stop so long as the stop has legitimate underpinnings. In Whren v. United States, 517 U.S. 806, 813 (1996), the United States Supreme Court rejected the argument that the "reasonableness of traffic stops depends on the actual motivations of the individual officers involved," ruling instead that a valid stop based on a traffic violation was permissible regardless of any pretextual motivation of the officer. In State v. Vineyard, 958 S.W.2d 730, 736 (Tenn. 1997), this Court concluded that in the context of traffic stops, the protections afforded by article I, section 7 of the Tennessee Constitution were coextensive with the protections afforded by the Fourth Amendment as defined in Whren. The stop of an automobile is, therefore, constitutionally permissible under both the Tennessee and federal constitutions when the police have either reasonable

---

[3] "The correct spelling of the defendant's name is 'Pulley'; however, it is cited by West Publishing Company as 'Pully.'" State v. Yeargan, 958 S.W.2d 626, 635 n.5 (Tenn. 1997) (Reid, J., concurring).

[4] Although there is no federal constitutional prohibition against an arrest for a minor traffic offense, see Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001), in State v. Walker, 12 S.W.3d 460 (Tenn. 2000), this Court concluded that Tennessee Code Annotated section 40-7-118 created "a presumptive right to be cited and released for the commission of a misdemeanor." Id. at 464. A full custodial arrest for a misdemeanor is permitted only when one of the statutory exceptions is met. See Tenn. Code Ann. § 55-10-207(f) (2008).

-6-

suspicion or probable cause to believe that a traffic violation has occurred, regardless of any ulterior motive of the arresting officer. Vineyard, 958 S.W.2d at 734; see also Pulley, 863 S.W.2d at 30.

It is undisputed that Officer Baker lawfully detained the Defendant for a traffic violation. In Mimms, the United States Supreme Court held that, for officer safety reasons, a lawful traffic stop authorizes officers, as a matter of course, to require drivers to exit their vehicles. 434 U.S. at 111 n.6; see also State v. Hanning, 296 S.W.3d 44, 54 (Tenn. 2009) (citing Mimms for the proposition that "once a vehicle has been lawfully detained, an officer may, as a matter of course, order the driver to step out of the vehicle"). In Mimms, an officer who made a traffic stop, but was otherwise without any articulable basis for suspicion of additional wrongdoing, ordered the defendant out of his car. After balancing the public interests against the right of the individual to be free of arbitrary interference by the police, the Supreme Court concluded that officer safety trumped the "de minimis" intrusion on the liberty of the individual and upheld the validity of the search. 434 U.S. at 111.[5] More recently, the Court of Appeals for the District of Columbia observed that "the clarity and force of the bright-line rule set forth in Mimms are sometimes under-appreciated, if not ignored entirely." Bullock, 510 F.3d at 344; see also State v. McConaughy, No. W2008-01645-CCA-R3-CD, 2010 WL 681361, at *8 (Tenn. Crim. App. Feb. 26, 2010) (observing that officers may generally direct a motorist to exit a vehicle in order to sign a citation). A majority of the courts that have addressed the issue, including this Court, see Berrios, 235 S.W.3d at 107, have endorsed the ruling in Mimms.[6] We conclude, therefore, that Officer Baker was entitled, as a matter of course, to remove the Defendant from the vehicle for a short period of time after making the traffic stop. While Officer Baker expressed a concern

---

[5] "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." Adams v. Williams, 407 U.S. 143, 148 n.3 (1972). In a 2006 publication, the United States Department of Justice reported that 6,000 police officers are assaulted each year, and ten are killed. United States v. Bullock, 510 F.3d 342, 349 (D.C. Cir. 2007).

[6] See, e.g., State v. Abner, 889 So. 2d 52, 53-54 (Ala. Crim. App. 2004); People v. Super. Ct. (Galbreath), 164 Cal. Rptr. 116, 117 (Ct. App. 1980); State v. Dukes, 547 A.2d 10, 22-23 (Conn. 1988); Salmeron v. State, 632 S.E.2d 645, 646 (Ga. 2006); State v. Askerooth, 681 N.W.2d 353, 367 (Minn. 2004); State v. Lozada, 748 N.E.2d 520, 527 (Ohio 2001); Commonwealth v. Reppert, 2002 PA Super 383 ¶ 2, 814 A.2d 1196, 1210; Clark v. State, No. 12-07-00396-CR, 2009 WL 223416, at *2 (Tex. Ct. App. Jan. 30, 2009) (not designated for publication); McCain v. Commonwealth, 659 S.E.2d 512, 516 (Va. 2008).

Our research indicates that only three states have explicitly rejected the Mimms rationale on state constitutional grounds and concluded that an officer cannot order a driver to exit the vehicle after a traffic stop without articulating some degree of objective suspicion. See State v. Kim, 711 P.2d 1291, 1294 (Haw. 1985); Commonwealth v. Gonsalves, 711 N.E.2d 108, 112 (Mass. 1999); State v. Sprague, 824 A.2d 539, 546 (Vt. 2003).

for safety only after indicating in his testimony that he routinely asked drivers stopped for traffic violations to step out of the car and did so in this instance to determine if alcohol might be involved, this does not negate the validity of his action.

Although the ruling in Mimms authorized Officer Baker to direct the Defendant to exit his vehicle after the stop, other circumstances could render the directive impermissible. As the trial court observed, the duration of an investigative detention should last no longer than necessary and should generally end when there is no further reason to control the scene or the driver of the vehicle. See Arizona v. Johnson, 555 U.S. 323, 333 (2009); see also Brendlin v. California, 551 U.S. 249, 258 (2007). "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983). This Court adopted the ruling in Royer in State v. Cox, 171 S.W.3d 174 (Tenn. 2005):

> The duration of [a traffic] stop . . . must be "temporary and last no longer than necessary to effectuate the purpose of the stop." "The proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." A traffic stop may be deemed "unreasonable," if the "'time, manner or scope of the investigation exceeds the proper parameters.'"

Id. at 179-80 (citations omitted).[7]

After being stopped for a traffic violation, however, a driver should expect "to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." Berkemer v. McCarty, 468 U.S. 420, 437 (1984); cf. Muehler, 544 U.S. at 101 (finding that because questioning of the defendant did not prolong the stop, no independent Fourth Amendment justification was needed for the questioning based upon the legitimacy of the initial stop). "[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Prouse, 440 U.S. at 654. Mimms and its progeny permit the intrusion if the officer merely removes

---

[7] Inquiries into matters unrelated to a traffic stop, however, do not convert the encounter into an unlawful seizure, so long as those inquires do not measurably extend the duration of the stop. Muehler v. Mena, 544 U.S. 93, 100-01 (2005); see also State v. Taylor, No. E2010-01817-CCA-R3-CD, 2011 WL 2120087, at *8-9 (Tenn. Crim. App. May 20, 2011) (discussing Muehler and determining that officer's actions in asking the defendant questions unrelated to the traffic stop had not "unreasonably exceeded the scope of the traffic stop").

a defendant from his vehicle absent undue delay. The question, however, of where a de minimis intrusion ends and an undue delay begins is necessarily a fact-specific inquiry. See United States v. Everett, 601 F.3d 484, 493-94 (6th Cir. 2010) (recognizing that "a fact-bound, context-dependent inquiry" must be conducted in each case to determine whether the duration of the stop was unreasonable). It is impossible to select "an arbitrary quantity of time and proclaim that any prolongation less than that amount is categorically 'de minimis' – as convenient as such a rule might be." Everett, 601 F.3d at 493. A number of cases,[8] including our Berrios opinion, however, illuminate the distinction. There, the officer not only stopped the defendant for speeding and frisked him for weapons but also placed the defendant in the back seat of a locked patrol car before checking his driver's license and vehicle registration. Because the evidence established that the officer had done so to test the anxiety level of the defendant as an investigative technique, we held that the extended detention, under those particular circumstances, did not qualify as "de minimis." Berrios, 235 S.W.3d at 107. The case before us is distinguishable on the facts. Officer Baker described the stop of the Defendant as "normal." Nothing in the record indicates that it lasted more than five minutes. Unlike the circumstances in Berrios, the intrusion was minimal.

---

[8] See, e.g., Taylor, 2011 WL 2120087, at *9-10 (finding that a stop, in which the defendant was asked several questions, asked to get out of the car, and which lasted around eighteen minutes, had not "unreasonably exceeded the scope of the traffic stop"); McConaughy, 2010 WL 681361, at *7 (holding that a citation process that lasted around thirty minutes and during which the officer asked the defendant three questions about narcotics and weapons did not exceed the scope of the traffic stop); State v. Fernandez, No. E2006-01781-CCA-R3-CD, 2007 WL 3072910, at *6 (Tenn. Crim. App. Oct. 23, 2007) (holding that one minute delay between the initial stop of the defendant and the officer's question regarding whether the defendant had any illegal substances and his request to search the defendant's car "was sufficiently contemporaneous with the issuance of the citation, such that there was no appreciable delay, and certainly no unreasonable delay"); see also, e.g., United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009) (holding that "the delay of approximately two minutes that occurred prior to [the police officer] developing reasonable suspicion to further investigate [the defendant's] identity was de minimis and did not unreasonably extend the duration of the traffic stop"); United States v. Peralez, 526 F.3d 1115, 1119-20 (8th Cir. 2008) (finding that the duration of the stop was unreasonably extended where the officer admitted that, for thirteen minutes of the sixteen minute stop, he asked the defendant questions that were unrelated to the traffic violation); Loper v. State, 8 A.3d 1169, 1172-73 (Del. 2010) (concluding that the stop, during which the officer asked the defendant for identification and ran a background check, "did not exceed the permissible scope of a routine traffic stop"); Bucalo v. Commonwealth, No. 2010-CA-000176-MR, 2012 WL 246245, at *5-7 (Ky. Ct. App. Jan. 27, 2012) (holding that a traffic stop, which lasted 105 minutes from the time of the initial stop until the defendant was arrested on drug-related charges, was unreasonable because "[t]he officers lacked reasonable suspicion to prolong the stop for purposes of conducting a drug dog sniff because there was insufficient evidence that [the defendant] was engaged in drug-related activity"); State v. Mason, 919 A.2d 752, 758 (Md. Ct. Spec. App. 2007) (ruling that a twenty-five minute delay following initial traffic stop for a narcotics-sniffing dog to arrive unreasonably extended the prolongation of the detention).

Officer Baker's request to have the Defendant exit his vehicle could also have been impermissible if he had asked him to do so after the traffic stop had been concluded. As indicated in the order upholding its original order of suppression, the trial court observed that its "ruling would be different had Officer Baker made the request to exit the vehicle prior to returning the driver's license." The record establishes that Officer Baker, the only witness at the hearing, testified that he had not, in fact, returned the driver's license before asking the Defendant to step outside the vehicle, and that upon further inquiry, the trial court confirmed the sequence of events as related by the officer, so stating in the initial order of suppression. In that regard, therefore, the evidence preponderates against the very finding upon which the trial court based its denial of the motion to reconsider. See State v. Brown, 294 S.W.3d 553, 561 (Tenn. 2009). The Court of Criminal Appeals, when addressing the issue, described as "implicit" in the trial court's ruling that the testimony of the officer was not credible. Donaldson, 2011 WL 4340854, at *11. We do not find that to be the case. Neither the original order of suppression nor the order denying the State's motion to reconsider questions the credibility of the officer. As to the pivotal facts, the trial court made the following assessment in the order granting the motion to suppress:

> Officer Baker wrote a citation for failure to stop and failure to use a[]turn signal and then returned to Defendant's vehicle. At that point, Officer Baker requested Defendant to step out of his vehicle so he could observe [his] demeanor and see if he had been drinking. Officer Baker testified he was planning to give Defendant the citation at that point, but when Defendant stepped out of the vehicle, Officer Baker observed a clear plastic bag containing white powder on the floorboard on the driver[']s side.

The trial court's recollection on the motion to reconsider that Officer Baker had testified that he had completed the citation ticket and returned the driver's license prior to the Defendant exiting the vehicle stands in contradiction, therefore, to the findings in the original order.

Even if Officer Baker had returned the Defendant's driver's license prior to requesting that he exit the vehicle, however, the traffic stop would not have been concluded. Our courts have previously held that "[w]hen a police officer issues a traffic citation or warning and returns a driver's license and registration, a traffic stop ceases to be a seizure . . . and becomes a consensual encounter . . . ." State v. McCrary, 45 S.W.3d 36, 42 (Tenn. Crim. App. 2000) (emphasis added).[9] Under the facts as construed in either of the trial court's

_____

[9] Furthermore, a person stopped for a traffic violation and issued a citation is required by statute to sign the document. See Tenn. Code Ann. § 55-10-207(b) (Supp. 2007) (stating that a person receiving a traffic citation "shall signify the acceptance of the citation and the agreement to appear in court as directed

(continued...)

orders, both requirements had not been satisfied. The traffic stop, therefore, had not been completed at the time the Defendant was asked to step out of his vehicle.

In summary, we are unable to distinguish the facts in this case from those in <u>Mimms</u>. The balance of the competing interests favors the safety of the officer over the minimal intrusion to an individual directed to step outside of his vehicle after a valid traffic stop. This rationale not only applies under the Fourth Amendment to the United States Constitution but also under article 1, section 7 of the Tennessee Constitution.[10] Similar to our holding in <u>Vineyard</u> that article 1, section 7 should be interpreted in the same manner as the comparable federal provision in <u>Whren,</u> our view is that the federal and state constitutional provisions apply coextensively to the circumstances we address today.

## Conclusion

Because an officer making a valid traffic stop may, for reasons of safety, routinely order a defendant out of a vehicle and because the trial court erroneously concluded that the officer had concluded the stop by handing the Defendant his driver's license before removing him from the car, the order of suppression is reversed. The cause is, therefore, remanded to the trial court for trial. Costs are assessed against the Defendant and his surety, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

_____

[9](...continued)
by signing the citation").

[10] This Court has previously held that under certain circumstances, our state constitution offers more protection than the corresponding provisions of the Fourth Amendment. <u>See, e.g.,</u> <u>State v. Jacumin</u>, 778 S.W.2d 430, 436 (Tenn. 1989); <u>State v. Lakin</u>, 588 S.W.2d 544, 549 (Tenn. 1979). In this instance, we see no reason to construe our constitution in a manner different from the federal constitution.